Statement of the Case.
MONROE, C. J.
Defendant, upon certain allegations of conspiracy to defraud, fraud and forgery, obtained an injunction against the execution of a writ of seizure and sale, issued at the instance of plaintiff, as the holder of defendant’s note for $6,000, secured by mortgage on his property.
The case, as presented by the evidence, is as follows: Defendant owned certain lots composing the greater part of the square of ground bounded by Canal, Olympia, Gasquet, and St. Patrick streets (Gasquet street being now called Cleveland avenue), and, as far back as 1906, imposed a mortgage upon the entire property to secure a note of $4,500, and, about the time that the note fell due, he was confronted with the demands of three persons, each holding a note of that description which each asserted was the genuine instrument; the holder of one of them being represented by Thompson B. Walker, an attorney at law. We find in the evidence a reference, also, to another alleged mortgage of $7,600, in which, as in the case mentioned, the signature of defendant is said to have been forged. The result was that defendant was plunged into a litigation, which cost him a great deal of both trouble and money, and part of which was terminated by the judgment of this court in Siekmann v. Vergez, 127 La., 944, 54 South. 295, in which it was held that one of the $4,500 notes was genuine, and that the others had been forged, probably, by the notary before whom the mortgage had been executed, and who was found to have done a great deal of work of that character and sent to the penitentiary.
In order to obtain the money wherewith to pay the debt that he owed, with the fees of his counsel in the litigation thus mentioned, defendant issued his note for $15,300, bearing interest at 8 per cent., and, paying off the existing mortgage debt with the proceeds, secured the uote by a new mortgage on the same property. A few years later, being but a milkman, and finding, probably, that the interest was more than his business could well bear, he sold part of the property, and, paying the proceeds to plaintiff (who was the holder of the note), reduced the indebtedness to $13,300. In 1914, he received an offer from the Reverend Eather Lorente (on behalf, as we understand, of the diocese of the Catholic Church) of $16,000 for another portion of the property, fronting on Canal, and extending back on Olympia street, and still leaving the third portion, upon which there are several cottages in the rear; the terms of the offer being one-third cash, and the balance in one and two years represented by the notes of the purchaser secured by mortgage and privilege, which offer he accepted, his sole purpose being to pay off his debt, which he supposed he would be able to do by turning over to plaintiff the notes of the Reverend Eather for the deferred payments and so much of the cash paid by him as might be necessary. When, however, on or about March 9, 1914, the parties met at the office of the notary to consummate the sale, and plaintiff to surrender his note of $13,300, receive the Lorente notes and cash, and consent to the cancellation of his mortgage, it developed that he was unwilling to enter into that arrangement; the reason assigned being that his note bore 8 per cent, interest and the Lorente notes but 7 per cent., though plaintiff, in his testimony, states that defendant had disappointed him, and that he did not care to have any further business with him. However that may be, when he declined the proposition that was made to him, further action in the matter of the sale was suspended, and Mr. Carrere, a real estate agent, who, through Mr. Brennan, another *199 agent, had conducted the negotiations for Father Lorente, was called in to assist in finding some one else who would take the Lorente notes and furnish (with the cash to be paid by Lorente) the money wherewith to satisfy plaintiff’s claim and clear the property, and Mr. Carrere proposed to furnish the money for that purpose, and clear the property of plaintiff’s mortgage, and any other incumbrance, on condition that he be given a mortgage for $10,000 on so much of the property as was not to be included in the sale to Lorente, with the Lorente notes as additional security, and paid a commission of 1 percent. (or $100) on the $10,000 for his services. His proposition was not acted on immediately, but on the next day (March 10th), defendant called on him, with T. B. Walker as his legal adviser, and accepted it. After accepting it, however, defendant found that he had some objections to it, and Walker strongly advised against it and suggested that he (Walker) might make a better arrangement; and, pursuant to that suggestion, a day or two later, he took defendant to call on Emanuel Weil, where he and Weil had a conversation in which, as we think, defendant did not participate and which produced no result. He then gave defendant more advice, negotiated with plaintiff, and brought about no less than three understandings; one between defendant and himself; another between plaintiff and himself; and the third between plaintiff and defendant, which, according to his version of the matter, were as follows (referring, first, to his understanding with defendant after their interview with Carrere), to wit:
“I says, Mr. Vergez, they have got you. You are tied up. They have got you. I cannot help you. Money is tight. It is one of two things —surrender to Mr. Carrere, or [and] you will have to pay for it- — for Mr. Carrere wants a $10,000 mortgage on all of your holdings. If you can borrow $6,000 upon the two pieces back of your property you will have to make some sacrifice — how much, I don’t know. Whatever the difference will be, in order to finance you, I will, pay it, and you will know what it is, and the balance, I will use it, and, when your note becomes due, I will take care of it.” Says he, “Mr. Walker, if, to-day, I have anything at all, I can thank you for it.”
On his cross-examination, touching the same matter, he said:
“Mr. Adams, I have told you, a while ago, that Mr. Vergez— It was one of two propositions with him. This note of Mr. Naef was becoming due April 12th. Father Lorente wanted title to the property that he [defendant] had agreed to sell. Mr. Vergez was bound to make title or to be sued for specific performance. I wanted to save him from a damage suit, or specific performance, or damages. He could not turn his property over, and, certainly, the church wanted their property.’ The note of Mr. Naef was becoming due April 12th, which I told Mr. Vergez: ‘When this becomes due, I will foreclose, and my fees will he $815 and costs. The sheriff’s costs of advertising your whole property and plunging you into litigation will be God knows how much more. You will have to make sacrifices. If you mortgage your property for $6,000, I will pay Mr. Naef what he demands, and I will use the balance, whatever is there, and when your note becomes due I will take care of it.’ ”
His own particular agreement with Naef and the understanding between Naef and Vergez are stated by the witness (after saying that he had telephoned to Naef to come to his office) as follows:
“Mr. Naef came over to my office. I says: ‘Mr. Naef, you have taken a chance of lending this money when you were not even secured with your loan.’ (The witness here refers to Naef’s original loan of $15,300, secured by mortgage upon the whole property, including a portion which had been sold and of which he had received part of the proceeds before this story begins.) T will give you $1,000 if you will finance him.’ Mr. Naef says to me, ‘Mr. Walker, that is a good bonus, but I want my money.’ ‘But,’ he says, T will see what I can do at the bank, and will see you tomorrow.’ I don’t know what Mr. Naef did. He went to the bank; then came back the following day; he told me he would finance it. I then sent for Mr. Vergez. We were in our office — Mr. Vergez, Mr. Naef, and myself. It was agreed that he was to mortgage his property for $6,000. Mr. Naef asked him the question; it was all understood.”
According to the position taken by plaintiff in this ease, the understanding upon which he acted was, that he was to surrender defendant’s note for $13,300, cancel the mort *201 gage by which it was secured, and lend defendant $6,000 in cash, for which he was to receive Lorente’s two notes of $5,333.33 each, amounting to $10,666.66, and so much of the cash payment made by Lorente as might be required to make up the balance of $13,-300, with interest, that was due him; and he was also to receive a mortgage, on that part of the property not included in the sale to Lorente, to secure his loan of $6,000. Under his agreement with Walker, he was to receive $1,000 cash, and he received that amount so promptly that he added it to the proceeds of the discount of defendant’s note for $6,000, and drew his check for .'the $6,000 that he was supposed to be lending defendant, against the balance so credited to his account, thus borrowing $5,000 on defendant’s note, at 6 per cent, and lending it back to him at 8 per cent., plus a bonus of $1,000. But, according to Walker’s testimony (and upon that point there is no dispute), defendant received nothing from the proceeds of the loan, the balance, after paying the bonus to plaintiff (which was increased, for some reason which he himself was unable to explain, to $1,125), having been absorbed by Walker, under his alleged agreement with defendant, that he would pay whatever plaintiff might demand and would use' the balance of the $6,000 and take care of defendant’s note when due — his “word,” he says, being his bond in the matter.
Defendant’s version is that on the day following the interview with Carrere, he went to Walker’s office and told him that he did not like the Carrere proposition in-that it called for a mortgage for two years and the payment of the commission, or the “one cent more” (as the witness describes it), and that Walker told him to come back later and he would be able to make a better arrangement ; that he went back on the next day (March 12th) and was told to come again. “The next day,” he continues, “I went again, which was, therefore, the 13th. On the 13th, when I went to his office, there he told me that he thought he could find some one, but he wanted $100 for his trouble. Then I told him, ‘All right; I will find the $100, if you will find some one to take the notes.’ After that he told me, ‘Come with me’; he said, T will bring you on the second floor, in an office,’ and then I followed him.” And he describes a visit to the office of Emanuel Weil, a friend of Walker’s, where he says he sat in a little waiting room while Walker and Weil talked together, and that nothing came of it; that Walker then told him to go home, and that he would find some one to take the Lorente notes, and let him know at 2 o’clock; that Walker came to his house at 2 o’clock, when defendant was milking his cows, and that, after the milking was finished, Walker told him that Naef would take the notes, but that he wanted $6,000 security for one year, and that if at the end of the year Father Lorente should pay his first note, then “we” (referring to Walker and defendant) “will take back the note” (to be given by defendant as security to the extent of $6,000) “and cancel the mortgage.”
“You will just come,” said Walker, according to the witness, “and sign the sale of the property, and Mr. Naef will take the notes. I told Carrere that Naef will take the notes; we had no need of him.” “Then,” said defendant, “I told him, ‘All right.’ Then he told me, ‘Come at 10 o’clock to-morrow; we will just sign the sale, and Tuesday we will sign the security mortgage.’ ‘All right,’ my wife told him that I would go. Saturday, the 14th, I went to his office. Then he told me, ‘Come, we will go to Legier’s (the notary’s). Then I told him, ‘Is not Mr. Naef coming here?’ He said: ‘No, he is not coming here. He will go to_Mr. Legier’s;’ and when we got there Mr. Naef and Mr. Walker and I, and Mr. Carrere and Mr. Brennan and Father Lorente and Mr. Legier, then Mr. *203 Legier read the act of sale. After that they made me sign, and Father Lorente signed the notes, and Mr. Legier gaye them to Mr. Naef, and I was waiting for him to give me the money that was coming to me” (a balance, it appears, of $603.47, for which Naef subsequently accounted); “but no, they gave the check to Mr. Brennan, and Mr. Naef took the cheek also, of what there was cash, and the notes, and I thought he was going to give my check to me. There was coming to me about $600 or $700 cash. But they gave me nothing. What do they do? We had already signed the sale and the notes and everything, and Mr. Naef took the notes; he took the money with it — the check of Father Lorente— and after that we left.”
Defendant says that he, plaintiff, and Walker went together as far as the Hennen Building, where Walker had his office, and that he then went home, leaving the other two together, and, being told to come back the following Tuesday, and “we will sign the security mortgage and we will finish.”
“Tuesday, the 17th,” he continues, “I went to Mr. Walker’s office and * * * he told me that Mr. Naef would like to put behind -that security that I could not sell the remainder of the property for one year without his consent. * * * After that we went to the office of Mr. Legier. When I got to Mr. Legier’s office, Mr, Walker and I, there was nobody there except Mr. Walker and I and the stenographer. After 10 or 15 minutes Mr. Naef came in. He told me, ‘Come and sit down at the end of this table. * * * I want to show you the statement which the bank has made for me here.’ He showed me the statement. It was marked so much cash that he had received and so many notes of Father Lorente. ‘There comes back to you,’ * * * he said, ‘$603.’ ‘All right,’ I said. Then he said, T want you to sign as security for $6,000 before Mr. Walker and me.’ I told him, ‘How, for a note of Father Lorente, which is only $5,000 and something, you want me to sign for $6,000 as security?’ He said: ‘Yes, for security; it is not much and, after Father Lorente will have paid the note — his first note — after that, I will return your note and cancel the mortgage.’ ‘All right,’ I said, just like that. * * * Mr. Legier came and c-alled us in his office (they had been sitting in a reception room). There was myself, Mr. Legier, Mi;. Naef, and Mr. Walker. Mr. Legier takes the act on the counter and asks if it is necessary to read that mortgage security. Mr. Walker replied to Mr. Legier that it was not necessary to read it, but only Mr. Naef asked to put at the end of that act of security that Mr. Vergez cannot sell that property without the consent of Mr. Naef. Then Mr. Legier called his stenographer. He comes, and he tells him to put as Mr. Walker had asked him. * * * And, after that, the stenographer went and wrote that behind the security mortgage. Mr. Legier explained to me, in French, that which the stenographer had put at the end. Then I- told him that it was all right. * * * Then he asked me to sign the mortgage security, and I signed it— the note and security. He gave it to Mr. Naef. While I was writing, Mr. Naef was passing papers to Mr. Walker. I don’t know what they were. * * * Q. Did Mr. Naef or anybody else give you a cheek for $6,000? A. No, sir. Q. Did Mr. Naef or anybody else give you $6,000 in money for that $6,000 mortgage note? A. No, sir; not a cent; I didn’t ask him either; it was a security. Q. Did you receive a $6,000 check, made by Mr. Naef, from Mr. Walker, or from anybody else, for this $6,000 note? A. Not a cent. * * * I, Mr. Walker, and Mr. Naef left. All along Carondelet street Mr. Naef was talking, and he told me, ‘It is a shame,’ he said, ‘A big sale like that; you haven’t got much money coming back to you, and you will pay a big price to the real estate *205 man for selling; you have not much money coming back to you.’ ‘Well,’ I said, ‘It is all right;’ that I was glad to have paid my debts, and that I didn’t owe another cent more; that it was finished.”
He testifies that when they reached the I-Iennen Building, Naef went on and he and Walker went up to Walker’s office; - that Walker then copied on a typewriter a statement such as he had seen at Legier’s office (being a statement which Walker at the request of Naef, had typewritten showing the transaction of March 14, from which there was a balance due defendant of $603.47), and requested him to indorse the check for “$603 and some cents,” which defendant did.
“After that,” he proceeds, “he took back the check in his hands, like that, you know, ‘How will you do to pay me my bill.’ You know, he told me, ‘Your bill, it was agreed, would be $100.’ ‘But I want $250.’ Then I told him. ‘How, $250, Mr. Walker; the price was agreed at $100; that is not just.’ He answered me that he did not know; that he had to give money to Mr. Naef, and I don’t know what all. Then I said, ‘Why is it Mr. Naef did not ask me that? Fie was with us. Why did not he ask that, if he wanted more money?’ ‘Well,’ he said, T want $250.’’ ‘Well,’ I said, ‘Give me that cheek, and I will give you one of my checks, and you will write it yourself.’ I gave him my bank [check] book, and he wrote it himself, ‘two hundred and fifty dollars.’ And after that he told me to sign it. I signed it. He said: Tut Pierre D. Vergez.’ I signed it ‘Pierre L. Vergez.’ After that he gave me one paper and I gave him that cheek. Then he gave me the check for $603 and another check' — which Mr. Legier had kept too much money. I think it was $66 and some cents; he had kept too much money for the taxes of 1914; he gave me the two cheeks then, and wrote on a piece of paper, to deposit the money in my book, and I went away to the bank.”
Defendant was then shown plaintiff’s check for $6,000, and asked when he had first seen it, to which he replied, “I think June 10th;” that it was the day after he had niade an affidavit charging Walker with the forgery of his indorsement that the check was first shown to him by his counsel, and had never been given to him by Mr. Naef, and that he had never seen it in Walker’s possession; that he had never received a cent of the proceeds, and had never written either P. L. Vergez or Pierre L. Vergez on the back of it, or authorized any one else to do so; that he had never discussed with Mr. Walker, or any one, the borrowing of $6,000; that he had no need to borrow, as there was $600 coming to him from the transaction of March 14th; and that he had never had any conversation with Naef about paying him a bonus of $1,000 from any loan of $6,000.
As stated by plaintiff, the sale to Dorente was consummated on March 14th, and on March 17th the note and act of mortgage were executed; the act being in the form of an ordinary mortgage to secure payment of a loan of $6,000, then made and acknowledged and represented by a note for that amount, which the mortgage was given to secure. The notary testifies that he started to read the act of defendant, in English, and that upon defendant’s stating that he did not understand it, he read it in French. We do not take him to mean that he did more than inform defendant that it was an act of mortgage, such as it appears to be;that is to say, he did not explain that it was intended to operate merely as security, in addition to the Dórente notes, for the payment of the amount advanced to pay the note held by plaintiff and otherwise to clear the property that had been sold of incumbrances, though he testifies that it was his understanding that it was so intended. He also testifies that he saw no money or check delivered to defendant and that he is confident that it would have attracted his attention if there had been any such delivery.
It will be observed that defendant, makes no mention of the check of $6,000, as having been in any way considered or dealt with in the interview between him and Walker at the office of the latter, after the execution of the act of mortgage. Nor does Walker refer to that check, in connection *207 with that interview, save in the bare statement that Vergez indorsed it, “P. L. Vergez.” He, however, admits, in the course of his testimony, that in consequence of Vergez’s protest against the fee of $250, which he then executed, he subsequently refunded $150; his confused statement on that subject winding up with the admission that, considering the $125 that he had given to plaintiff (over and above the $1,000) he finally realized only about $25 as his fee. His testimony, on cross-examination, concerning defendant’s information as to the fact that he was paying plaintiff a bonus of $1,000 and 8 per cent, interest on a loan of $5,000 and was lending the $5,000 to him (Walker) without interest, security, or acknowledgment of any kind reads, in part, as follows:
“Q. Did you know that Mr. Vergez was in embarrassed financial circumstances? A. I did not know, sir. Q. Have you not just said that over and over again? A. Oh, well, to finance the proposition, certainly, sir. It was a large amount of money. Q. Did you tell Mr. Vergez that you were borrowing $5,000 from him? A. Certainly. Q. Did Mr. Vergez agree to loan you $5,000? A. Certainly; the act of mortgage speaks for itself; I could not take him by the throat and make him do it. Q. Does the act of mortgage say anything about you getting $5,000? A. No, sir; we would call that earmarks in a mortgage. There are no ‘ifs’ or ‘ands’ here. Q. Did you testify in your own behalf in the criminal district court? A. No, sir; I did not. Q. Is not this the first time you have ever made any such explanation? A. The first time.”
The signing of the check for $250, “Pierre L. Vergez,” and indorsing of the check for $6,000, “P. L. Vergez,” alike, gave trouble. The check for $250 was refused payment because the signature did not conform to that held by the bank. The bank, upon which the check for $6,000 was drawn, at first refused to certify it, on the ground that plaintiff had not completed his “arrangements,” which consisted of having defendant’s note for $6,000 discounted, and receiving and depositing the $1,000 that he had been promised by Walker. When those ar-1 rangements were completed and the check certified, Walker’s bank (he being the person then in possession of the check) refused to receive it on deposit, on the ground that the indorsement “P. L. Vergez” did not correspond with the name of the payee, “Pierre L. Vergez,” as written on the face of the instrument. Walker testifies that he thereupon sent his office boy to Vergez’s house with the request that he indorse the check properly, and that the boy returned with the second indorsement, “Pierre L. Vergez,” whereupon it was received on deposit and Walker immediately drew two checks (with several smaller ones), the one, for $1,500, in favor of Weil, and the other, for $1,125, in favor of plaintiff. His explanation of the addition of the $125 to the $1,000, tkát plaintiff himself thought was a “good bonus,” is, that he, in that way, divided his fee with plaintiff, and that he thought plaintiff was entitled to it. Plaintiff’s version of the matter makes of it another of the many unusual circumstances of the case. Thus he testifies, on cross-examination:
“Q. Where did this $125 come from? A. Oh, this; Mr. Walker gave it to me; I don’t know why. Q. Gave it to you, for what? A. Told me it was a portion of his fee; that I was entitled to it. Q. Well, were you entitled to it? A. Well, I don’t think any one refuses money when it is given to them by the real owner. That is the only way I can suppose that. I told Mr. Walker I wasn’t entitled to it, but he said, ‘Yes, go ahead; I give it to you.’ ”
The office boy testified that he carried the check for $6,000 to Vergez’s house and delivered the message that he had received —that it should be indorsed Pierre L. Vergez — and that defendant took it into the house (while the witness waited on the gallery) and brought it back indorsed. as requested. It appears from the testimony of defendant that the boy brought out the check for $250, which was improperly signed and that, at his (Vergez’s) request, he filled out another check which Vergez signed, in place of the one brought by him. *209 Vergez, however, denies that the $6,000 check was ever brought to him. The boy was asked, on cross-examination, whether he had not admitted to defendant’s counsel that the $250 check was in his handwriting, and he answered in the affirmative. He was asked whether both checks had not been shown to him, and he answered, “Yes.” His further testimony reads as follows:
“Q. Now, did I not ask you bow many times you bad been to Mr. Vergez’s bouse? A. Yes, sir. Q. And did you not tell me that you had been there only once? A. No, sir; I never. Q. Did you not tell me that you did not know (which) of those two checks you had brought to Mr. Vergez’s house? A. The first day I said I did not remember of bringing them there, and then you sent for me, the following day, and I told you I brought both of the checks there. Q. I sent for you the following day? A. Yes, you sent for me the following day that I was there; I was there one day, and the following day you sent for me; I don’t remember which day. Q. Did not you deny, at all times, to me and Mr. Burns, that you knew which one of those checks you brought there? A. No, sir; I did not. Q. Did not I tell you this: ‘Well, one of the checks you say is in your handwriting ; don’t that help you to remember? A. Yes, sir. Q. Now you admit having lied once, don’t you? A. Yes, sir. Q. Are you telling the truth now? A. Yes, sir.”
Defendant’s senior counsel testified as follows:
“Shortly before Walker’s arrest, I sent for the boy to ask him about the checks — the two checks — which I had in my hands. When the boy came, I showed him the two checks, one for $250 and the other for $6,000, and I asked the little boy if he had brought either one of those checks out to Mr. Vergez’s residence. He said he brought one, but he did not know which check, and he stated to me that one of the checks was in his handwriting. I asked him then if that helped him to remember which check he had brought out to Mr. Vergez’s house, and he said he (it) did not. He stated emphatically that he had only brought one check out to Vergez’s house and that, on one occasion. Q. Who was present at that interview? A. You [the junior counsel] were present.”
The junior counsel corroborated the testimony of the senior counsel, and further said:
“He [the boy] did state that he went out with a cheek, and wrote the check out at Mr. Vergez’s house, and we asked him how many times did he go out to the house, and he stated that he only went out to the house once.”
Emanuel Weil, summoned by plaintiff, testified that Walker called on him, and then came a second time, bringing Vergez, to get assistance in clearing the property to be sold to Dórente, but that he “could not see it.” He also gave the following testimony:
“I advised that Mr. Vergez should borrow that money on the three double cottages, and I further advised, to save cost, as I understood that Mr. Oarrere was willing to make the loan, but wanted to charge him $100, I believe, to make the loan, outside of the 8 per cent, interest, to have Mr. Degier pass the act of mortgage.”
He says that he understood that Vergez wanted to borrow $6,000; that he (Walker) and Vergez were present at the interview, and that Vergez understood what was being done, as he explained it to him.
“Q. What did he [Vergez] say he wanted those $6,000 for? A. What did he say he wanted it for? Q. Yes. A. I can’t remember; I don’t know that he wanted it for anything except to pay what was due to Mr. Naef, or the holder of the note, that was on the property.”
He testified that he knew “Tom Walker” very well; had known him before he was married. Being asked whether he was called as a witness for Walker in his trial in the criminal court, he replied that he was not so called. Being asked whether he was in the city at that time, his testimony reads as follows:
“A. If you could tell me what month the trial was, I could tell you better. Q. It was in September, 1914. A. I don’t believe I was in the city at that time. Q. Will you swear you were not? A. Well, now let me look at my records; I won’t swear to anything unless I look up where I was. I could tell that very shortly.”
I-Ie was asked whether the examining committee had not refused to recommend him for admission to the bar, because, not having the required certificate, he had held himself out as a lawyer, and his answer was that “they refused on account of the City Directory holding it out as such.” He *211 was asked whether he did not have. his name, in caps, in the Directory, “Law and Notarial Office,” and he answered, “I really could not say that, unless I saw it.” Asked if he did not know that he paid the Directory for so printing his name, he said, “I suppose I pay them yet.” He was asked, “Did not the committee hold — I want an answer, yes or no — that you were not a fit person, morally, to practice law for that reason?” and his reply was, “Not that they told me, morally. Q. What did they hold? A. They held, as it appeared in the Directory, that I appeared as a lawyer, that they could not qualify me. That was my knowledge of it, not morally.” 1-Ie further testified as follows:
“Q. On the 17th of March, 1914, did you receive a check for $1,500 from Thompson B. Walker? A. I would have to look up my books. Q. Did he owe you any money? A. Walker owed me money on a matter — owed my client money. Q. What client? A. Client I represented; I don’t know if I should answer what client; I say it was a client of mine. Q. Well, on the 17th of March, did he pay you the sum of $1,500? A. My books would show whether he paid it to me for account of myself or somebody else. I am willing to look it up and give you that data, if you wish. Q. You cannot state from memory whether he did or not? A. No, I could not state. If he paid it, it would be there. I would like now to make this statement to the court. Mr. O’Sullivan (plaintifE’s counsel) : Before you make this statement, will you kindly furnish the court with proof that Walker paid you $1,500 on the 17th of March? The Witness: If I can find it there, if the check was paid me for account of somebody, I can find it. Mr. O’Sullivan: You will find the entry somewhere? A. Oh, yes; I remember a transaction in which Walker was interested, a note pledged; if that was the matter, I will look it up, the money was paid to my client.”
The record fails to show that the witness ever looked it up. Mr. Carrere testifies that his proposition, made on March 9th, at Legier’s office, in presence of Father Lorente, Legier, plaintiff, and defendant, was to finance the pending affair so that the plaintiff’s mortgage should be satisfied and the sale to Lorente consummated, the condition being that he should be given a mortgage for $10,000 on that portion of the property that was not to be included in the sale to Lorente, and, as additional security, the Lorente notes, it being clearly understood that payments of the Lorente notes when made were to be credited and go in extinguishment of the debt so created, and that he was to be paid a commission of 1 per cent, on the $10,000 for his services. He says that the proposition was accepted, either that day (March 9th) or the next, and, so far as he could remember, that Walker was present with Vergez when it was accepted; the facts being that the proposition was accepted at his office on the following day (March 10th) in an interview between Carrere, Vergez, Walker, and probably Brennan. Plaintiff and Walker deny that they ever heard of the proposed charge of 1 per cent, (or $100) as commission.
Upon the trial in the criminal court, plaintiff, after testifying that he delivered his check for '$6,000 to defendant, at the notary’s office, and that defendant Walker and himself went from the notary’s office to the Hennen Building where they separated, and that the transaction there ended, until Mr. Bums, defendant’s junior counsel (quoting his testimony)—
“I think, wrote me a letter to come around and see him. I went to see the gentleman. He asked if I had given my check for this mortgage; I said, ‘Certainly I have.’ I said, ‘Furthermore, if there is anything you desire to know in reference to that, see Mr. Walker; he is my attorney.’ That ended that. * * * Q. You went to Walker and told Walker? A. Told Walker that Mr. Burns had asked whether I had given my check for that mortgage, and said, ‘Yes;’ also said if he wanted to know anything further to see him, as you were my attorney. Walker said, ‘All right.’ ”
He testified that he stopped at Walker’s office on the morning of March 17th, when on his way to the office of the notary, and gave Walker his check, payable to the order of Pierre L. Vergez for the $605.47, bal *213 anee due Vergez on the transaction of March 14th; and further as follows:
“Q. Now, wasn’t Mr. Walker conducting all the business around at Mr. Legier’s office, as far as Mr. Vergez was concerned? Wasn’t he the mouthpiece of Mr. Vergez? A. He was his attorney. Q. He was your lawyer? A. Yes, sir. Q. Lawyer for both people? ' A. Yes, sir.”
His examination as a witness in the instant case reads in part as follows:
“Q. When Mr. Burns called on you, did you not tell him to go and see my lawyer, Mr. Walker? A. No, I think I told Mr. Burns to go and see Mr. Walker; that he was the attorney in the case. Q. Did you not swear to this in the criminal court (testimony was then read and shown to him) ; didn’t you swear to that? A. Well, he is my attorney; he is still my attorney. Q. He is still your attorney? A. Certainly; precisely; as soon as he practices. Q. He was your attorney with reference to this particular transaction here? A. No; I don’t say he was my attorney in this transaction because I didn’t require an attorney. Q. You say, even under the circumstances presently existing, that Walker is still your counsel, if he were practicing law? A. Correct. Q. And that irrespective of his conviction by the criminal court? A. Because I believe the man innocent, Mr. Adams; that is all I can state; I have a right to my belief.”
The testimony above quoted, beginning, “Now, was not Mr. Walker,” etc., was then read to him, and about the same line of examination was conducted with about the same result.
Walker having testified that he told defendant that, unless he succeeded in arranging to pay, at maturity, the note held by Naef, he (Walker) would foreclose the mortgage, gave the following testimony on that subject:
“Q. Now, as I understand your evidence, you were the one who proposed to Mr. Naef to receive the $1,000? A. Yes, sir; yes. Q. For whom were you acting? A. For Mr. Vergez. Q. Who was the lawyer, if any, who was acting for Mr. Naef? A. None, that I know of, sir. * * * Q. In all this transaction between you and Mr. Vergez, I think you have stated you were the attorney for Mr. Vergez? A. Absolutely, sir. Q. And you don’t know who, if any, was the attorney for Mr. Naef? A. No, sir.”
Counsel for defendant testified that, in the interview that they had with plaintiff after they had been consulted by defendant (which was a^month or two after the transaction of March 17th) plaintiff said nothing about having received the bonus of $1,000 from Walker. Plaintiff’s recollection was different, and it seemed to be understood that he was to produce, as a witness in his behalf, a gentleman who was present at one of those interviews, but, though the door was left open, the gentleman was not produced.
Mr. Burns, the young attorney who was first employed by defendant, testified that he called upon Mr. Walker at the suggestion of Mr. Naef, and, as follows:
“I went over to Mr. Walker’s and sat down and told him that Mr. Vergez had employed me to look into an act of mortgage that Mr. Naef had held. I said, ‘Mr. Naef informed me that he bought this note; that is not the understanding; how about that?’ Right there, he said. ‘Vergez didn’t get a damned cent; not a cent was passed.’ ‘Well,’ I said, ‘How about the act?’ ”
He then states that Walker gave something of a history of the matter; said that Oarrere charged too much, and that Weil charged too much; and as follows (quoting conversation between Walker and the witness) :
“Finally,” he said, “I persuaded Mr. Naef to take the Lorente notes, and a little mortgage of $6,000 to guarantee Mr. Naef against any loss by reason of changing the nature of his obligations that he held. I said to him, ‘Why, what was the reason of giving that? Mr. Naef took the cash payment, and the property was well worth the balance that was still due.’ He said, ‘Well, you know how these things are.’ * * * I said, ‘Well, look here, you haven’t got any stipulation in that act to that effect.’ He says, ‘That is all right; Mr. Naef is all right. He has got plenty of money. He is not going to part with the note. When the year is up, Mr. Naef will surrender it.’ ”
The witness having stated that he called on Walker at the suggestion of Naef, his cross-examination proceeded as follows:
“Q. That is the reason why you went there? A. Yes, sir; and in all my dealings subsequent with Mr. Walker, I was dealing with Mr. Naef’s *215 attorney. Mr. Walker made numerous statements to me, as to his relationship with Mr. Naef. He stated that he had known Mr. Naef a long time, and when I taxed him with the return of his note, he said he did not like to do it — didn’t want to lose Mr-. Naef’s business; such a statement — of that character — as led me, all along, to believe that he was Mr. Naef’s attorney, and I had Mr. Naef’s own word for it at the start.”
Plaintiff testified that his reason for giving his check for $6,000, and taking Walker’s check for $1,000 to make good his account in the bank, instead of merely drawing his check for $5,000, was to make the transaction “clear.” He testified in the criminal court that the agreement as to the $6,000 was entered into after the transaction of March 14th, and that when he went to Walker’s office and gave his consent defendant was not there. He admitted on the trial of this case that the agreement was entered into before the transaction of March 14th, and testified to a faint recollection of an interview between defendant Walker and himself, but was positive that nothing was said by defendant as to his reason for desiring to borrow $6,000, after which, however, he was able to recall that upon some occasion, the date of which he was unable to fix, both defendant and Walker told him that it was needed to pay the claim of a niece or relative of defendant, against his estate — Gentilly Terrace, or Lake View.
Defendant testifies that there was no such niece or relative at that time, and that his conversations with plaintiff in regard to the $6,000 transaction took place after the transaction of March 14th, and more particularly at the notary’s office on the morning of March 17th, when they met for the purpose of executing the mortgage, and that on both occasions, Naef spoke of it as a matter of additional security.
Plaintiff offered the testimony of an expert in handwriting of the paying teller of the bank upon which the check for $6,000 was drawn, and in which defendant kept his account and of the paying teller of another bank, to the effect that, in their opinions the names, “P. L. Vergez” and “Pierre L. Vergez,” as indorsed upon that check, were the genuine signatures of defendant. The expert came from another city. Photographic copies of defendant’s genuine signatures and of the alleged forged signatures were forwarded to him on Saturday; he reached New Orleans on Monday, when the originals were placed in his possession, and he gave his testimony on Tuesday. The two paying tellers disclaimed any expert knowledge on the submony upon their habits of observation; one of them had accepted, as genuine, three or four forged signatures, in 37 years, and had rejected many signatures, as forged, but does not say how many, if any, turned out to be genuine; the other had accepted no forgeries during an experience of “7 or 8 years.” His testimony on that point reads:
“I haven’t come across one yet. I threw out a couple of them; I don’t remember which ones, but I remember throwing them out. In my opinion, they were forgeries. It was so long ago that I haven’t got a clear idea of it. Q. And some of them which were not forgeries? A. Well, the checks were made good, or paid, one or the other, I don’t remember clearly about it.”
As we understand his testimony, he passed upon, and cleared as genuine, the alleged signatures on the back of the check in question, and he testified, as he had testified in the criminal prosecution, that he still believed them or one of them to be genuine; that is to say, he considered the “P. L. Vergez” a genuine signature, because it conformed to the signature which defendant had furnished to the bank as its guide. As to the “Pierre L. Vergez,” he said:
“Well, the ‘L. Vergez’ is Ms; ‘Pierre,’ I don’t want to'pass on that. The ‘P’ is also, but he does not sign that way in our bank; his signature with our bank is ‘P. L.,’ and I am only supposed.to pay according to those signatures.”
*217 Some testimony was admitted, over defendant’s objection, to show that plaintiff is a man of good reputation for honesty. It is necessary to add to this statement that Mr. Walker was convicted of forging defendant’s signature, as payee, on the check for $6,000, and was sentenced to serve at hard labor in the penitentiary, and that, his sentence having been affirmed by this court, he was serving under it at the time of the trial in the court a qua.
Opinion.
Defendant testified through an interpreter, and is evidently a French peasant. On giving his testimony in the Siekmann Case (offered in evidence in this case) he said:
“I can write French, but not so very well; but I can write my name. ♦ * * I sold milk; I was a milkman and had very little occasion to write.”
In this case, he said that, when Walker called at his house, he was milking his cows. Also, that when Walker demanded the fee of $250, and insisted on it, he said to him:
“ ‘Give me that check [for $603.47], and I will give you one of my checks, and you will write it yourself.’ I gave him my bank book, and he wrote it himself”
—and that Walker wrote the deposit slip upon which he deposited the checks of $603.-47 and $66 and some cents, and that, when the boy came to get another check in place of the check for $250, which at Walker’s request he had signed “Pierre L. Vergez”:
“Then I took him in the kitchen, on the table, and Mr. Mautemps was present, and I told the little boy, ‘Give me that cheek, and I will give you another check from my book, and you will write it — the same check — and I will sign it, like in my book (meaning with his bank signature).’ He wrote it out himself, and I signed it as in my book, ‘P. L. Vergez,’ and he went away.”
From which, we conclude that defendant is not an accomplished penman, in fact, that he might be called illiterate, without seriously impinging upon the truth. We also conclude that, though illiterate, he is not unintelligent, and that perhaps because of his inability to aid himself in his business by reading and the use of papers and memoranda, he is a close observer who carries the details of his transactions in his mind and remembers them with greater accuracy than those who feel that they have other means of establishing past occurrences. Counsel for plaintiff endeavor to impeach his veracity by saying that, in the Siekmann Case, he denied his signature to either of the notes sued on, but that this court found that he had signed one of them. This court, however, found, spread upon the face of that record, in several places, defendant’s distinct admission that he had signed one note and one mortgage for $4,500; that he was ready and willing to pay that amount to the holder of the genuine note; and that, of the three notes upon which he was sued, two were forged — a finding with which plaintiffs leading counsel should be familiar since he represented the innocent holder of one of the notes found to be forged. It is said, also, that plaintiff denies that the notary read or explained the act of mortgage sued on in this case, whereas the contrary is established by the testimony of the notary and other witnesses. But we are of opinion that defendant, the notary, and the other witnesses were equally sincere in testifying as they did on that point. The notary was instructed by Mr. Walker, at that time a member of the bar, professing to represent defendant, to prepare, for defendant’s signature, a note for $6,000, and an act of mortgage securing the same, and he obeyed his instructions. It was his understanding, from what had previously taken place, that the note and act were to serve as additional security to some one who had been found to buy the notes that had been given by Father Dórente, and, whatever might have been his opinion as to the 'advisability of *219 putting the security in that shape, it was no part of his duty or business to meddle with a matter which, presumably, the parties, including the defendaht, represented by his legal adviser, were competent to determine for themselves. The understanding as to the real purpose to be subserved by the note and mortgage was entirely outside of, and at variance with, that expressed upon the face of those instruments, and, for aught that the notary knew, might have been embodied in a separate written contract, and there was nothing for him to explain on that subject. We have no doubt that he did explain to defendant that he was giving a note secured by mortgage, and we understand defendant to mean, when he says that the matter was not explained to him by the notary, that it was not explained that those instruments might be used for what they purported to be, but that explanation was due from defendant’s attorney, not from the notary, who, it is admitted, did especially call the attention of the defendant to the clause that was added to the contract purporting to give plaintiff an option on the mortgaged property. Being an ignorant man, unfamiliar with the English language, and having employed an attorney to protect his interests, defendant had the right to rely upon it that the attorney would discharge that duty, and see that he was protected. The story that he tells of his experience is entirely consistent in itself and with all the surrounding circumstances and probabilities. With the thrift of his class, he had put the savings of a business, consisting of the milking of cows and delivering the milk to his customers, in what he considered the safest and most solid of investments. Through no fault of his own he became involved in a lawsuit which cost him a great deal of both trouble and money, and he fell heavily in debt and mortgaged his property. The interest upon the mortgage amounted to over $1,200 a year, and, even after the debt had been reduced to over $1,000 a year — more, probably, than his business could bear, and he determined to sell part of the property and free himself from debt, a determination which required no little moral courage, since no one readily sacrifices the property in which he has invested his hard-earned savings, and least of all a French peasant, who considers it little short of a crime to impinge upon his capital. He found a purchaser who. offered him $16,000 for a certain part of the property; a price sufficient to enable him to pay his debt and, as it turned out, leave him a surplus of $603.47. The terms of the sale were one-third cash and the balance in one and two years, with interest at 7 per cent., and he assumed, or understood, that his creditor would be willing to accept the cash and the purchaser’s notes in satisfaction of his claim; but the creditor was not willing, and it became necessary to make some arrangement of the matter. Precisely why, after the payment, in cash, of $5,333.33, on the price of the property, sold for $16,000, and well situated, the notes for the balance of the price, secured by mortgage and vendor’s lien, should not have been considered sufficiently safe, the record does not inform us. Plaintiff states that his reason for not taking them was that defendant had promised to give him the preference, as a purchaser, in the event of his concluding to sell the property, and that, having failed to keep his promise, he did not care to have any more business with him.
Defendant testifies that the reason given by plaintiff was that he would thereby be exchanging an 8 per cent, for a 7 per cent, investment. However that may be, Carrere made a proposition, which, if accepted (and assuming that he expected 8 per cent, interest on the money to be advanced and that the Lorente notes would have been paid at maturity), would have resulted in a *221 credit in favor of defendant, at the end of two years, of something like $400. On the other hand, according to the scheme concocted by Walker, and whieh it is the purpose of this suit to carry into effect, defendant was to pay plaintiff a bonus of $1,000 and interest at 8 per cent, for a year, for a loan of $5,000, merely that he might lend the $5,000, with no security and not even an acknowledgment of its receipt, to a man whose overcharge of $150 in the matter of a fee for getting him into this trouble, he was, about that time, successfully protesting against, and to whom he was under no manner of obligation.
We dismiss, at once, and entirely, the idea that defendant ever entertained such a proposition for a moment, or ever heard of it until long after the events out of which this litigation has arisen. We find that he was induced to sign the note and act of mortgage here sued on by deceit and false representations whieh led him to believe that they were to be held merely as additional security for the payment of the Lorente notes; and we further find that he-never received or indorsed the check for $6,000 issued by plaintiff, and never saw or heard of it until long after it had been honored by the bank upon which it was drawn and the proceeds divided between Walker and the plaintiff. The conclusions thus stated necessarily involve the rejection of the testimony given by plaintiff’s principal witnesses, and our reasons for so rejecting it are, we think, fairly obvious from the statement which precedes this opinion.
It is shown that plaintiff was anxious to get out of debt, and had effected an arrangement whereby he was about to do so; that he did not wish to borrow any money, and that there was no reason why he should; and that, considering the character of the man, and the condition of his affairs, as then existing, and which were well known to the plaintiff, the idea that he would have consented to the scheme here set up is so difficult of belief as to require positive testimony of the most reliable character. But, while Walker is loquacious in regard to many of the incidents of the affair, he is reticent to a degree concerning the “understanding” between defendant and himself, and, according to the testimony of the plaintiff, there would appear to have been no understanding between him and defendant whatever, save as represented by the act of mortgage.
Walker testifies that he told defendant that, if he could borrow $6,000, “you will have to make some sacrifice — how much, X don’t know — whatever the difference will be, in order to finance you, I will pay it, and you will know what it is, and the balance I will use it, and when your note becomes due, I will take care of it.” And, from that time, though defendant issued his note for $6,000 and mortgaged his property, though he is said to have received and put in his pocket, indorsed and delivered to Walker, and then to have indorsed again, a check for $6,000, payable to his order, and again to have delivered it to Walker’s messenger, it is not suggested that a word ever passed between him and Walker or between him and plaintiff on that subject. Apparently he never asked Walker how much of a sacrifice had been required of him, or how much of the $6,000 it was that Walker was to use. We have no details whatever in regard to the interview in Walker’s office at which we are given to understand that the check was indorsed and turned over to Walker. The acts were performed, apparently, in dead silence, and defendant evinced no curiosity whatever as to the destination of the proceeds of the check or any part of them, and, though he was sufficiently interested in the matter of Walker’s overcharge of $150 to protest against it, he allowed $6,000 to pass through his hands to a bourne whence dollars seem not likely *223 to return, without a whisper. It .was at that interview that Walker requested defendant, who was about to sign “P. L. Vergez” on the check of $250, to sign “Pierre L. Vergez” instead, and we ask ourselves why he did so. When an attorney has had a dispute about a fee and the dispute has ended, and the client is about drawing his check for the amount claimed, it appears to us a very peculiar thing that the attorney should request that the check should be signed in one way rather than another, and, particularly so, when, as happened in this instance, the way suggested is different from the usual way, and the signature different from that which had been furnished to the drawer’s bank. One would suppose that a man who keeps an account in bank should know best how to draw his check against such account. The reason for the request must have been entirely disconnected from the question of getting the money; in fact, as it turned out the suggested signature did not get the money, and another cheek, with the recognized signature, had to be substituted for it. In the meanwhile, since Wjalker had obtained the requested signature, what use did he make of it? I-Ie had the check for $6,000 in his possession at that time, and it bore on its face the name Pierre L. Vergez as payee, and had to be so indorsed before it could be collected, and the collection was somewhat urgent, since Walker says that plaintiff was telephoning about that time for the cheek of $1,000 that had been promised to him, and that was needed to make good his account against the check of $6,000, ahd the $1,000 check could not well be issued by Walker until the $6,000 check had been received on deposit to the credit of his account. In that situation it is evident that, if the $6,000 check was to be collected without being brought to defendant’s attention, his signature, as Pierre L. Vergez, would have to be forged, and equally evident that the forger would need an original signature in that form as his model, and it appears to us not unlikely that it was for that reason that defendant was requested to put that signature on the $250 check which he gave to Walker. The “boy,” unquestionably, took the check for $250 out to Vergez’s house, since he, there, at the kitchen table, filled out the body of the check that was substituted for it, and .yet, within a couple of months, when he was interrogated by defendant’s counsel, he stated that, though he said that he had taken but one check to Vergez’s house, he was unable to remember, even when the filling out of the $250 was called to his attention, which of the two checks it was that he took. That story would not, of course, hang together, and, on the criminal trial, he appears to have mended it, and to have said that he had taken out both the checks, or “two” checks.
It was shown that the story told by Walker, in this case, was not set up by him as a defense in the criminal prosecution, and yet, if believed, it should have acquitted him. If defendant stated in the presence of Weil that he was trying to borrow $6,000, Weil’s testimony to that effect in the criminal court would have been important, since defendant seems always to have been insisting that he did not want to borrow money, had never intimated that he did, and had not authorized any one to borrow for him, and, if it had been shown that, in that respect, his statements were false, a jury might, perhaps, have believed the story told in this court by Walker. Mr. Weil’s memory was, however, very defective. Unlike defendant, who is unable to stow away his facts in books, Mr. Weil appears to be unable to keep the run of even the most interesting events without referring to his books. He could not remember whether he was in the city when Walker was tried, though he knew Walker well and might reasonably have expected to have been called as a witness, for, not only did Walker visit him *225 about the matter here in question, but, from the proceeds of the $6,000 check on the very day that he received it, he sent Weil a check for $1,500. And Weil was unable to remember, and unless he could see his books, whether he had collected that amount for his own account or for a client; until, finally, in reply to a question by plaintiff’s counsel, he did recall a transaction in which Walker was interested, “if that was the matter”; he would look it up; a note was pledged; the money was paid to the client of the witness. • And yet, from the haste with which the cheek, was sent, the matter appeared to be urgent and such as might have been remembered by-Mr. Weil for some time. Upon the whole, we are not able to rely very greatly upon his memory.
Plaintiff was not called as a witness for Walker in the criminal case, probably because he knew, or professed to know, nothing of the understanding between Walker, defendant, and himself concerning this matter. Walker has testified that plaintiff, defendant, and himself arrived at the understanding at an interview at which they were all present, and plaintiff, at one time, thought that he had a faint recollection of an interview between the three of them, but not of any common understanding, which seems somewhat out of the way, since he was about investing $5,000 in a loan, upon most extraordinary terms and one would suppose that he would have been interested in knowing, from the proposed borrower, himself, what his views were. Defendant throws some light upon the subject by testifying that, in the notary’s office, just before the signing of the note and mortgage, plaintiff took the trouble to explain that his understanding was that the two instruments were to be executed by way of additional security.
Just after the inquiry, provoked by de-^ fendant, began, say in June, 1914, plaintiff referred defendant’s attorney to Walker, as Ms attorney, but in his testimony he denied that he had done so in language attributed to him, and it was then shown that he had stated in the criminal court that Walker was his attorney. He then took the position that he did not mean that Walker was his attorney in this particular transaction. We find that the language used by him is susceptible of no other interpretation than that Walker was his attorney in and throughout this particular transaction; in addition to which it otherwise appears that, though Walker was employed and paid by defendant to help him, he was concerned, principally, in helping himself, and, next to himself, in helping plaintiff; the defendant, who should have been his real client, having been utterly betrayed and sacrificed. We do not hold that the plaintiff deliberately conspired and worked to perpetrate the fraud of which defendant complains, but it appears to us that he must have been blinded by the prospect that was held out to him of making an enormous profit in a comparatively small transaction, otherwise its rottenness could hardly have escaped him; and we hold that he is bound by his sworn statement that Walker was acting as his attorney, and hence that, as between him and the defendant, the loss resulting from Wjalker’s misconduct must fall upon him. Beyond that, in view of the denial of the defendant of the testimony of the notary in corroboration of that denial of the facts, that plaintiff had theretofore dealt principally with Walker and had, that mornr ing, gone out -of his way. to leave a check, payable to the order of defendant, at Walker’s office, and that Walker, in order to pay the $1,000 to plaintiff and for other reasons of his own, was obliged to get possession of the check for $6,000 immediately, we are convinced that it was delivered by plaintiff to him, and not to defendant.
We have considered the testimony of the expert and of the bank officers upon the sub *227 ject of the alleged signatures of the defendant, and we credit them with entire good faith in the giving of it; but it is conceded that bank officers make mistakes in such matters, and we shall venture to assume that the expert detecters of forgeries are no more infallible than the expert forgers.
In Wharton’s Cr. Ev. by Hilton (10th Ed.) vol. 2, § 563, it is said, among other things:
“The personal factor in all expert testimony is far more evident than it is in the testimony of those witnesses who testify to facts that are matters of common knowledge and common observation. For this reason, it is better for the court to instruct the jury that they shall accept the testimony of an expert in handwriting, even when uncontradicted, as an argument, rather than as proof of the fact, and to make allowance for those personal factors, which, to an extent, at least, may influence the judgment of an expert.”
Mr. Walker, the principal actor in this matter, was prosecuted for the forgery of defendant’s signature on the back of the $6,000 check, and was duly convicted. In overruling his motion for a new trial, the learned presiding judge said:
“The verdict of the jury was fully warranted by the evidence on the trial, and I am satisfied that the evidence on the application for new trial would not change the result.”
And the new trial was refused, the sentence was pronounced, and, on appeal, was affirmed by this court. State v. Walker, 137 La. 197, 68 South. 407.
The learned judge before whom the instant case was tried summarized his findings and concluded his opinion as follows:
“1. That the mortgage of $6,000, executed by defendant, was for collateral security to the Lorente vendor’s lien notes, and not to effect a loan of $6,000 from plaintiff to defendant.
“2. That defendant was not a party to the deal by which plaintiff issued his check for $t>,000.
“3. That defendant did not receive said check, did not know of its issuance, did not see or indorse it, and that, of the proceeds of said check, the plaintiff received $1,125, and Walker received $4,875, and defendant received not one dollar.
“Under these circumstances, to permit the plaintiff to foreclose said collateral mortgage, when it does not appear that the Lorente notes, for which it was given in security, have not been paid, would be a monstrous wrong to the defendant.
“I do not care to comment upon the testimony.
“That given by defendant, corroborated, as it is, -by that of Legier, of Carrere, and Bums, and by all the circumstances of the case, have left no doubt on my mind.”
Judges of higher character, greater ability, and wider experience than those whom we have thus quoted are not to be found, and our extended consideration of the case here presented has satisfied us, upon the facts, as we were previously satisfied upon the law involved in the criminal appeal, that there is no error in the judgment appealed from, which holds that the mortgage here in question is to be regarded as additional security to the mortgage and vendor’s lien notes executed by the Reverend Father Lorente, and may be executed only in' the event said obligations are not satisfied.
Some reference is made in the brief of plaintiff’s counsel to the fact that defendant’s" counsel took the stand as witness in behalf of their client, and the observations of this court in Succession of Harkins, 2 La. Ann. 926, and other cases, to the effect that it is undesirable that the attorneys of litigants should appear as witnesses, save in extreme cases when all other means of proof are impossible, and that they then should withdraw from professional connection with the case, are quoted.
The Civil Code (article 2283) declares that the employment of an attorney or counsellor at law “does not disqualify him from being a witness in a case in which he is employed.” It is undesirable, for obvious reasons, that he should so appear, and the suggestion that, where the necessity arises, he should withdraw from professional connection with the case meets with our approval. The case here presented is, however, very exceptional in its character, and it may well be that the *229 counsel felt that they could neither withhold their testimony nor withdraw from the case without serious prejudice to the interest of their client. The facts testified to by them were important and could have been proved by no one else. The junior cpunsel took no active part in the trial save on one occasion, and then on the suggestion of plaintiff’s counsel.
Judgment affirmed.